Dennis Stewart (SBN 99152)
Kirk B. Hulett (SBN 110726)
**GUSTAFSON GLUEK PLLC**
600 B Street
17th Floor
San Diego, CA 92101
Telephone: (619) 595-3299
dstewart@gustafsongluek.com
khulett@gustafsongluek.com

***Counsel for Plaintiff and the Proposed Class***
*Additional Plaintiff's Counsel Appear*
*on the Signature Page*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD HARRIS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SK ENERGY AMERICAS, INC.; SK TRADING INTERNATIONAL CO. LTD; VITOL INC.; AND DOES 1-50,<br><br>Defendants. | Civil Action No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Donald Harris, on behalf of himself and all others similarly situated, brings this class action complaint for damages, restitution, and injunctive relief against Vitol Inc. ("Vitol"), SK Energy Americas, Inc. ("SK Energy"), and SK Trading International Co. Ltd. ("SK Trading") (collectively "Defendants") for violations of Section 1 of the Sherman Act (15 U.S.C. §§ 1, 2, 3), the California Cartwright Act (Cal. B&P Code §§16720 et seq., and the California

Unfair Competition Law, Cal. B&P Code §§ 17200 et seq. ("UCL"). Plaintiff is informed and believes, and thereon alleges the following:

## NATURE OF ACTION

1.      On February 18, 2015, a disastrous explosion occurred at a Torrance, California gasoline refinery that, at the time, produced about 20% of the gasoline sold in Southern California and 10% of the gasoline sold statewide.[1] The incident caused a market disruption upon which Defendants—horizontal competitors and major traders in the California spot market for gasoline and gasoline blending products—capitalized on to restrain competition in the relevant market.

2.      Defendants Vitol, SK Energy, and SK Trading engaged in a scheme to artificially inflate gasoline prices and to maintain those artificially high prices. Defendants carried out their market manipulation scheme by using various tactics including (1) deploying sham transactions to obfuscate the true gasoline supply and demand in California, (2) trading amongst themselves to purposely engineer increases in the gasoline spot market, and (3) entering into unreported arrangements to share the profits of and to hide their unlawful conduct.

3.      As a result of Defendants' scheme, Plaintiff and class members paid a premium on gasoline prices and continued to do so well after the effects of the refinery's explosion on supply had dissipated.

4.      Defendants' misconduct was uncovered on May 4, 2020 when the California Attorney General filed a redacted complaint exposing Defendants, alleging that although Defendants "may not have created the supply disruption", they certainly "exacerbated the effects

---

[1] *See* U.S. Chemical Safety & Hazard Investigation Board "ExxonMobil Torrance Refinery Investigation Report" No. 2015-02-I-CA (May 3, 2017), available at https://www.csb.gov/file.aspx?DocumentId=6023 at p. 6-8.

of that disruption to illegally enrich themselves at great cost to California consumers" in violation of the Cartwright Act and Unfair Competition Law.[2]

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over the federal antitrust claims pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1367.

6.      Venue is proper in this district pursuant to 15 U.S.C. §§ 15(a), 22, and 28 U.S.C. §§ 1391, because a substantial part of the events giving rise to Plaintiff's claims occurred in this district, a substantial portion of the affected interstate trade and commerce was carried out in this district, and one or more of the Defendants reside in this district or is licensed to do business in this district. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal restraint of trade throughout this district. The anticompetitive conduct alleged herein has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business in this district.

7.      Under Local Rule 3.2, this civil action should be assigned to the San Francisco Division because the trade and commerce affected by Defendants' illegal conduct was substantially conducted with, directed to, or impacted Plaintiff and class members in counties within the division. Furthermore, the San Francisco spot market is within this division.

## PARTIES

### A. Plaintiff

8.      Plaintiff Donald Harris is a citizen of the State of California. He purchased gasoline at retail during the Class Period defined herein for his own use and not for resale, and was injured as a result of Defendants' misconduct alleged herein.

---

[2] Compl. at pp. 2-3, *The People of the State of California v. Vitol Inc. et al.,* No. CGC-20-584456 (Cal. Super. May 4, 2020), available at https://oag.ca.gov/system/files/attachments/press-docs/CGC-20-584456%20Public%20Complaint%20only.pdf

3

**B.  Defendants**

9.      Defendant Vitol, a Delaware corporation, is an energy company with its principal place of business in Houston, Texas. Vitol is registered with the California Secretary of State to conduct business in California. Vitol and a related entity are not strangers to unlawful trading conduct. The Federal Energy Regulatory Commission sued Vitol and one of its traders to collect $3.75 million in fines levied against them after finding Vitol's trading activity manipulated California electricity markets.[3] Vitol S.A. was fined five million Euros by French authorities for manipulating the French southern gas trading point "Peg Sud" between June of 2013 and March of 2014.[4]

10.      Defendant SK Energy is a California corporation with its registered office in Houston, Texas. Defendant SK Energy is an indirect, wholly-owned subsidiary of Defendant SK Trading.

11.      Defendant SK Trading is a South Korean corporation headquartered in Seoul, South Korea.

12.      SK Trading is the indirect parent of SK Energy. SK Trading is also a sister company to SK Energy Co., Ltd. ("SK Energy Korea"), the largest refiner of crude oil in Korea. All these entities are subsidiaries of SK Innovation Co., Ltd. ("SK Innovation"), a publicly traded holding company headquartered in Seoul, Korea. SK Trading publicly describes its subsidiary SK Energy as the marketing agent for SK Energy Korea in the United States and

---

[3] ECF No. 1, *Federal Energy Regulatory Comm'n v. Vitol, Inc.*, No. 2:20-cv-00040-KJM-AC (E.D. Cal. Jan. 6, 2020).
[4] REUTERS, *UPDATE 1-French regulator fines Vitol 5 mln euros for gas market manipulation*, (October, 9, 2018), https://www.reuters.com/article/vitol-france-fine-gas/update-1-french-regulator-finesvitol-5-mln-euros-for-gas-market-manipulation-idUSL8N1WP399.

explains that SK Energy facilitates the export of SK Energy Korea's gasoline and gasoline blending products to the United States.

13.     SK Trading dominated and controlled SK Energy, and specifically ratified the illegal conduct engaged in by SK Energy that is described herein. SK Trading and SK Energy Korea list their headquarters at the same address as SK Innovation.

14.     At all relevant times, Defendant SK Energy was an agent and alter ego of Defendant SK Trading, due to the nature and extent of control that SK Trading exercised over SK Energy.

15.     At all relevant times, there existed a unity of interest and ownership between SK Energy and SK Trading such that any separateness between them had ceased to exist and SK Trading controlled, dominated, managed, and operated SK Energy. Specifically, SK Trading controlled the business and affairs of SK Energy such that distinctions between the companies were mere technicalities.

16.     Additionally, at all relevant times, SK Energy was acting within the course and scope of its agency with the knowledge, consent, permission, authorization, and ratification, either express or implied, of SK Trading in performing the acts alleged in this Complaint.

**C.  The DOE Defendants**

17.     DOES 1-50 are other individuals or entities who engaged in or abetted the unlawful conduct set forth in this complaint. Plaintiffs intend to seek leave to amend this complaint upon learning the identity of Doe Defendants.

**D.  Agents and Co-Conspirators**

18.     Throughout the Class Period, Defendants were and are the agent of each of the remaining Defendants, and in doing the acts alleged herein, were acting within the course and scope of such agency. Each Defendant ratified, participated in, or authorized the wrongful acts of

each Defendant. Defendants are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions that are subject of this Complaint. Defendants have participated as members of the conspiracy or acted with or in furtherance of it, aided or assisted in carrying out its purposes alleged in this Complaint, and have performed acts and made statements in furtherance of the violations and conspiracy.

19.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. The Attorney General for the State of California has expressly named individuals and corporate executives who were involved in the conspiracy. Plaintiffs expressly reserve the right to amend this complaint to add such individuals, as appropriate.

## FACTUAL ALLEGATIONS

**A. California's Unique Gasoline Industry**

20.     According to the California Department of Energy, gasoline is the most used transportation fuel in California. In 2015, 15.1 billion gallons of gasoline were sold to California drivers. As the country's most populous state, and the state with the most licensed drivers and registered vehicles, California has a high demand for refined gasoline.

21.     Moreover, the process by which gasoline reaches consumers is different on the U.S. west coast and specifically, in the State of California, compared to the rest of the country.

22.     First, the supply chain starts with the extraction of crude oil and its transport to refineries such as the one in Torrance, California where it is processed into gasoline and other petroleum products. Next, the gasoline is sold wholesale and transported by truck to retailers where it is then purchased by consumers.

23.     Due to California being geographically isolated from other U.S. refineries, particularly from the oil refining hotbeds in Texas and the Gulf Coast, and the lack of pipelines that ship finished gasoline products into the state, gasoline distributors are forced to ship additional refined gasoline and gasoline blending products by marine vessel when local supply is low.

24.     Furthermore, California has a unique vehicle emission standards called California Reformulated Gasoline Blendstock for Oxygenate Blending ("CARBOB"). Most of the CARBOB consumed in California is produced by refineries located in clusters near metropolitan centers in the San Francisco Bay Area and in the greater Los Angeles area. Gasoline produced out-of-state do not meet these more stringent CARBOB specifications and thus, is not a substitute source of supply for CARBOB-compliant gasoline.

25.     One of the largest Southern California CARBOB refineries is in Torrance (the "Torrance Refinery"). The Torrance Refinery, owned by ExxonMobil Corp. in 2015, produces approximately twenty percent of all of the gasoline sold in Southern California and ten percent of the statewide supply. The Torrance Refinery also has the capacity to produce significant quantities of alkylate, a high-quality gasoline blending component.

26.     Unexpected disruptions to the supply chain, such as the explosion at the Torrance Refinery, leads to a delayed capacity to produce CARBOB-compliant gasoline for California consumers. California is also forced to import CARBOB-compliant gasoline which can take several weeks or more to arrive at ports.

**B. Trading in California's Gasoline Spot Market**

27.     The "spot" market refers to the purchase and sale of fuel that physically changes possession at or near a refinery hub for delivery (like a pipeline or a barge). Spot market sales of

1   wholesale gasoline typically involve minimum increments of 5,000 barrels (210,000 gallons) to

2   50,000 (2.1 million gallons) at a time.[5]

3        28.    California has two spot markets—one in Los Angeles and one in San Francisco.

4   The spot market prices are influenced by prevailing gasoline prices of the billions of gallons

5   traded daily on the New York Mercantile Exchange ("NYMEX"). NYMEX prices are public so

6   that pricing is transparent to all market participants.

7        29.    However, NYMEX's pricing on wholesale commodities—like gasoline—reflect

8   national and international factors as well as regional and local supply and demand conditions. In

9   many of California's spot market sales, the buyer and seller only negotiate the basis while the

10  final price is determined by adding the basis to the price set by the NYMEX.  Accordingly,

11  NYMEX spot prices for gasoline play a limited role in gasoline pricing by local traders.

12  

13       30.    Wholesale (or "Rack") purchases are made throughout points in the fuel

14  distribution system. These purchases are conducted in 8,000-gallon increments, which is the

15  amount of fuel that an average fuel truck is capable of carrying. Companies that re-sell fuel

16  professionally (or "jobbers") as well as retailers and end users (for example, trucking companies)

17  retrieve their fuel from the wholesale racks. The prices tied to the sale of gasoline from these

18  racks moves up or down based on movements in the daily California spot market.

19       31.    Additionally, with respect to the gasoline itself, there are two types of CARBOB-

20  regulated gasoline that are traded on the spot markets in California: Regular CARBOB

21  ("Regular") and Premium CARBOB ("Premium"). Premium trades at a higher price than

22  Regular and is traded with far less frequency. These two types of gasoline are created when

23  alkylate, a high-quality gasoline blending product, is added with other blend stocks to create

---

5 *See Spot Market Pricing Overview*, OPIS By HIS Market (June 3, 2020),
https://www.opisnet.com/product/pricing/spot/.

gasoline. Alkylates are a key component to achieving high octane ratings required to sell Premium gasoline at retail in California.

32.     Unlike NYMEX, the gasoline spot market in California for both Regular CARBOB and Premium CARBOB gasoline are traded through non-public transactions sometimes coined as "over-the-counter" ("OTC") trades. Because OTC trades do not occur with complete transparency compared to trading through an exchange like NYMEX, prices on the California spot market are not made immediately public. Instead, gasoline traders rely on price reporting services which report market prices from market participant sources such as refiners, traders, and brokers. Indeed, the most popular reporting service in California for the gasoline spot market is the Oil Price Information Service, LLC ("OPIS"). OPIS is a subscription-based service that publishes a daily report, known as the OPIS West Coast Spot Market Report (the "Spot Market Report"), which both buyers and sellers alike use as an industry pricing benchmark in California. OPIS subscribers have access to the Spot Market Report and can also receive market updates from OPIS throughout the day that include reported deals and other industry news.

**C. Federal and State Law Prohibit Fraudulent and Deceptive Commodities Trading in the Spot Market**

33.     Spot market trading of gasoline must comply with California's commodities fraud statute. *See* Cal. Corp. Code § 29504. This statute makes it unlawful to engage in certain fraudulent acts when buying or selling commodity contracts. *See* Corp. Code § 29536, subds. (a), (b), (c), (d).

34.     Under section 29536(c), it is unlawful to "[t]o willfully engage in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon any persons." *See* Corp. Code § 29536(c).

35.     In addition, the federal Commodity Exchange Act ("CEA") makes unlawful certain types of prohibited transactions. *See* 7 U.S.C. § 6c. Specifically, the CEA prohibits any transaction that "is, of the character of, or commonly known to the trade as, a 'wash sale' or 'accommodation trade.'" *See* 7 U.S.C. § 6c(a)(2)(A)(i).

36.     The CEA also prohibits a transaction that "is used to cause any price to be replied, registered, or recorded that is not a true and bona fide price." *See* 7 U.S.C. § 6c(a)(2)(B).

**D.  Defendants' Illegal Conduct**

        ***a.   Prior to the Torrance Refinery Explosion***

37.     During the Class Period, Vitol was a major participant in the gasoline spot market trade as it both bought and sold spot market contracts in California for various types of fuel products, including CARBOB Regular and CARBOB Premium.

38.     Additionally, throughout the Class Period, Vitol imported gasoline and gasoline blending products into the State of California.

39.     Vitol employee Brad Lucas ("Lucas") was the primary trader at Vitol tasked with trading gasoline and gasoline blending products that were delivered via pipeline within California.

40.     While at Vitol, Lucas reported directly to John Addison ("Addison"), a Vitol executive who reported to the President of Vitol Americas. Addison, in addition to supervising Lucas, also had the responsibility of trading gasoline and gasoline blending products that were delivered via marine vessels to the State of California.

41.     During the Class Period, SK Energy and SK Trading (collectively "SK") were major participants in the gasoline spot market trade as both bought and sold spot market

contracts in California for various types of fuel products, including CARBOB Regular and CARBOB Premium.

42.     Additionally, throughout the Class Period, SK imported gasoline and gasoline blending products into the State of California.

43.     SK Energy employee David Niemann ("Niemann") was the primary trader at SK responsible for executing trades in California with respect to California's gasoline spot market. Shelly Mohammed ("Mohammed"), an employee of Niemann's, was the gasoline scheduler.

44.     SK Energy functioned as SK Trading's California trading arm at all relevant times during the Class Period. And while Niemann and Mohammed were considered to be employees of SK Energy, SK's U.S. West Coast trading operations were conducted within the control and supervision of SK Trading and its subsidiaries. SK Trading also reviewed and approved key decisions to coordinate its trading activity with Vitol.

### b.   The Torrance Refinery Explosion

45.     On the morning of February 18, 2015, there was a massive explosion at the Torrance Refinery.

46.     The blast took place within the "fluid catalytic cracking" ("FCC") unit, which holds a crucial role on the refining of CARBOB gasoline; specifically, the FCC unit produces high-quality blending products like alkylate. Up until the explosion, the FCC unit at the Torrance Refinery produced a large portion of all of the high-octane alkylate produced in California.

47.     Due to the explosion, the Torrance Refinery closed the FCC unit and reduced production of gasoline products, like alkylate, until repairs could be completed. Due to this unforeseen circumstance, ExxonMobil needed to replace the lost alkylate production in California if it wanted to continue producing and refining CARBOB-regulated products.

### c.   Defendants' Unlawful Conduct Post-Explosion

48.     Beginning at least as early as February 2015, and while using the explosion at the Torrance Refinery as cover for their illegal efforts, Vitol and SK Energy – through Lucas, Niemann, Mohammed, and others – reached agreements amongst themselves to raise, fix, and otherwise tamper with the price of refined gasoline in California. Defendants were able to carry out the scheme by manipulating OPIS-reported prices in order to actualize supra-competitive profits while limiting market risk. As alleged above, OPIS-reported pricing is used by buyers and sellers in California to benchmark the spot price of gasoline.

49.     Defendants specifically engaged in direct or indirect trades between them that were reported to OPIS with the intent of inflating the OPIS-published price for Regular CARBOB and Premium CARBOB gasoline. Occasionally, Defendants used an intermediary broker, and, at other times, Defendants transacted directly with each other. The goal of this conduct was to create the illusion of a supply and demand imbalance for refined gasoline and to drive up spot market prices to artificial highs during strategic pricing windows.

50.     These transactions were often "leveraged" because they involved intentionally taking losses on the purchase of smaller quantities of gasoline in order to increase the profits on the sale of larger quantities of gasoline or alkylate. For example, Defendants traded Regular gasoline contracts directly or indirectly with one another at artificially high prices early in the trading day so that OPIS would report the artificially inflated purchase price to other market participants. This signaled a supply and demand imbalance to the market that caused the artificial inflation of spot market prices.

51.     Furthermore, Defendants executed intentionally market-spiking trades for Premium CARBOB gasoline to increase the strategic prices for alkylates—the price of which is generally tied to the OPIS-reported spot price for Premium gasoline.

52.     Defendants' manipulation of spot prices for Regular CARBOB gasoline also influenced the price of alkylate because spot prices for Regular CARBOB gasoline and Premium CARBOB gasoline move in tandem.

53.     Thus, in order to realize their supra-competitive profits with respect to alkylate, Defendants worked together to inflate the price of Regular CARBOB and Premium CARBOB during key pricing windows, and then proceeded to coordinate their importation of alkylate during the Class Period into California at supra-competitive prices.

### d.   Defendants' Active Concealment of Their Unlawful Conduct

54.     Defendants executed secondary "wash" trades[6] intended to hide or disguise their conduct, to limit or eliminate market risk on reported trades, and to share their anticompetitive profits amongst each other.

55.     By hedging each of their reported trades, the secondary transaction ensured that there was little to no market risk associated with Defendants' conduct.

56.     Moreover, Defendants had names for their illegal agreements, which they called "joint ventures" or "JVs," which, in reality, were nothing more than a conspiracy between so-called competitors to artificially increase spot market prices for Regular CARBOB and Premium CARBOB gasoline in California.

57.     During the Class Period, the Defendants' illegal conduct generated millions of dollars in profits for conspiracy members each month. Lucas and Niemann financially benefitted

---

[6] A "wash trade" is "a form of fictitious trade in which a transaction or a series of transactions give the appearance that authentic purchases and sales have been made, but where the trades have been entered without the intent to take a bona fide market position or without the intent to execute bona fide transactions subject to market risk or price competition.

directly from the conduct alleged herein. The below chart depicts the effect of Defendants'

illegal conduct on gasoline prices before and during the Class Period.[7]



58.     Additionally, the production of CARBOB gasoline in California did not change,

despite the explosion at the Torrance facility. There was no supply shock to account for in order

to explain the surge in pricing on the spot market and for consumers during the Class Period.

59.     Defendants' recurrent manipulation of the spot market price caused retail gasoline

prices to be higher throughout the Class Period. Defendants' profits were made to the detriment

of California consumers.

60.     The impact of Defendants' scheme was substantial, costing retail gasoline

purchasers like Plaintiff and class members billions over the Class Period. In 2018, Californians

paid an average of 30 cents more per gallon than residents of other states at common retailers.[8]

---

[7] *See* Severin Borenstein, *California's Mystery Gasoline Surcharge Strikes Back,* Energy
Institute at HAAS (Feb. 10, 2020), https://energyathaas.wordpress.com/2020/02/10/californias-
mystery-gasoline-surcharge-strikes-back/.

[8] California Energy Commission, "Additional Analysis on Gasoline Prices in
California," www.energy.ca.gov, p. 1, https://www.energy.ca.gov/sites/default/files/2019-
10/Gas_Price_Report_0.pdf.

The California Energy Commission ("CEC") conducted a detailed analysis of potential causes and estimated that California gasoline consumers paid an additional $1.5 billion in 2018 and $11.6 billion over the last five years.[9]

### E. The California Attorney General Action

61.     On May 4, 2020, California Attorney General Xavier Becerra announced the filing of a lawsuit against Defendants for alleged manipulation of California's gas prices resulting in artificially inflated retail gasoline prices. The suit alleges that Defendants seized on the market disruption caused by the Torrance refinery explosion to drive up gas prices and keep them at supracompetitive levels.

62.     The Attorney General's press release states that Defendants engaged in market manipulation through trades that were:

> selectively reported to the Oil Price Information Service, LLC (OPIS)—the most widely used gasoline reporting service in California—in order to drive up the benchmark prices of Regular and Premium gasoline in OPIS's Spot Market Report. The companies, through two traders who were friends and former colleagues, colluded to drive up the price of OPIS-reported trades during pricing windows for large sales in order to increase the price of gasoline in the state to their profit. The firms engaged in unusual and otherwise irrational market-spiking trades with each other and third parties that had the effect of driving up prices prior to large trades—and they were successful in doing so, artificially moving and inflating the price of Regular and Premium gasoline so effectively that the prices moved or stayed unaccountably higher than the supply and demand prevailing . . . . By driving up benchmark prices, the companies were able to sell their own product at a higher price, and inflate costs for consumers.[10]

### TOLLING OF THE STATUTES OF LIMITATION

---

[9] *Id.* at p. 2.

[10] Press Release, *Attorney General Becerra Announces Lawsuit Against Two Multinational Companies for Manipulating Gas Market, Costing Californians More at the Pump*, https://oag.ca.gov/news/press-releases/attorney-general-becerra-announces-lawsuit-against-two-multinational-companies.

63.     Class member purchases of gasoline within four years prior to the filing of this Complaint are not barred by the applicable four-year statute of limitations and are not required to be tolled in order to be actionable.

64.     Plaintiff and the Class did not know of Defendants' illegal conduct until the California Attorney General filed its complaint against Defendants on May 4, 2020. Further, Plaintiff and the Class had no reason to believe that they paid prices for gasoline that were affected by Defendants' illegal conduct prior to that date, and thus had no duty to investigate the claims set forth in this Complaint until May 4, 2020. Defendants' secret joint venture agreements were inherently self-concealing.

65.     Defendants engaged in affirmative conduct that was designed to mislead and conceal their illegal conduct. For example, Vitol's Lucas affirmatively misled the CEC about the true cause of high prices for gasoline that followed the Torrance Refinery explosion in February 2015.

66.     Defendants repeatedly misled OPIS about the true nature of their trading activities by reporting artificially high spot trades directly or indirectly between them but concealing the existence of offsetting wash trades that reduced or effectively limited any market risk in the primary trade.

67.     Additionally, the California Attorney General, as representative of the people of the State of California, obtained tolling agreements with Defendants that are applicable to the claims of Plaintiff and the Class, in whole or in part. These tolling agreements have effective dates of August 3, 2018, and March 8, 2019, respectively. Defendants and the California Attorney General subsequently executed additional tolling agreements to extend the termination dates of the tolling periods specified in the original agreements. These termination dates have not passed as of the filing of this Complaint.

68.     Accordingly, to the extent that tolling is necessary to advance some or all of the claims alleged by Plaintiff and the Class, the four year statutes of limitations governing claims under the Sherman Act, the Cartwright Act, and the UCL were tolled at least until May 4, 2020 pursuant to the injury-discovery rule, the doctrine of fraudulent concealment, and by virtue of express tolling agreements between the California Attorney General and Defendants.

## CLASS ACTION ALLEGATIONS

69.     Plaintiff brings this action on behalf of himself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a) and (b) on behalf of:

> All persons or entities who purchased gasoline from a retailer within the State of California from February 18, 2015 until December 31, 2016 (the "Class Period").

70.     Specifically excluded from the Class are: (a) any of the Defendants named herein; (b) any of the Defendants' parent companies, subsidiaries, and affiliates; (c) any of the Defendants' officers, directors, management, employees, subsidiaries, affiliates or agents; (d) all governmental entities; and (e) the judges and chambers staff in this case, as well as any members of their immediate families.

71.     Plaintiff does not know the exact number of class members. Plaintiff is informed and believes that, due to the nature of the trade and commerce involved, there are millions of class members geographically dispersed throughout the State of California, such that joinder of all class members in the prosecution of this action is impracticable.

72.     Plaintiff's claims are typical of the claims of his fellow class members because Plaintiff purchased gasoline during the Class Period. Plaintiff and all class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all class members.

73. Numerous questions of law or fact common to the entire Class—including, but not limited to those identified below—arise from Defendants' anticompetitive and unlawful conduct:

    a. Whether Defendants contracted, combined or conspired with one another to restrain trade in the spot market for gasoline at any time during the Class Period;

    b. Whether Defendants' conduct caused the prices of gasoline sold at retail to be higher than the competitive level as a result of their restraint of trade;

    c. Whether Plaintiff and the other class members were injured by Defendants' conduct and, if so, the determination of the appropriate classwide measure of damages; and

    d. Whether Plaintiff and other class members are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

74. These and other questions of law and fact are common to the Class and predominate over any questions affecting the class members individually.

75. Plaintiff will fairly and adequately represent the interests of the Class because he purchased gasoline at retail within the State of California during the Class Period and has no conflicts with any other class member. Furthermore, Plaintiff has retained sophisticated and competent counsel who is experienced in prosecuting antitrust class actions, as well as other complex litigation.

76. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

77. This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will

eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

78.     The prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF THE SHERMAN ACT
### (15 U.S.C. § 1 – Injunctive Relief Only)

79.     Plaintiff hereby repeats and incorporates by reference each preceding paragraphs as though fully set forth herein.

80.     Defendants entered into and engaged in a continuing combination, conspiracy, or agreement to unreasonably restrain trade or commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially restraining competition with respect to the price of gasoline within the State of California.

81.     Defendants' activities constitute a per se violation of Sections 1 of the Sherman Act.

82.     Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiff and class members by restraining competition and thereby raising, maintaining, and/or stabilizing the price of gasoline at levels above what would have occurred if competition had prevailed. For this conduct, Plaintiff and class members are entitled to entitled to injunctive relief pursuant to 15 U.S.C. § 26.

### COUNT II – VIOLATION OF THE CARTWRIGHT ACT
### (California Business and Professions Code section 16720 et seq.)

83.     Plaintiff hereby repeats and incorporates by reference each preceding paragraphs as though fully set forth herein.

84.     Defendants entered into and engaged in a continuing combination, conspiracy, or agreement to unreasonably restrain trade or commerce in violation of California Business and Professions Code § 16720 et seq. by artificially restraining competition with respect to the price of gasoline within the State of California.

85.     Defendants' activities constitute a per se violation of the Cartwright Act. Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiff and class members by restraining competition and thereby raising, maintaining, and/or stabilizing the price of gasoline at levels above what would have occurred if competition had prevailed. For this conduct, Plaintiff and class members are entitled to entitled to treble damages and injunctive relief pursuant to California Business and Professions Code section 16750(a).

## COUNT III – VIOLATION OF THE UNFAIR COMPETITION LAW
### (California Business and Professions Code, section 17200 et seq.)

86.     Plaintiff hereby repeats and incorporates by reference each preceding paragraphs as though fully set forth herein.

87.     Defendants committed acts of unfair competition, as described above, in violation of the UCL.

88.     Defendants' conduct constitutes an "unlawful" business practice within the meaning of the UCL, and includes, without limitation, the following: violating the Sherman and Cartwright Acts, as set forth above; and engaging in wash sales and otherwise manipulating the benchmark prices reported on the California gasoline spot market in violation of California Corporations Code §§ 29535, 29536, 29537, 29538) and the Commodity Exchange Act, 7 U.S.C. § 1 et seq.

89.     Defendants' conduct separately constitutes an "unfair" business practice within the meaning of the UCL because Defendants' practices have caused and are "likely to cause substantial injury" to the Plaintiff and class members that is not "reasonably avoidable" by them.

20

90.     Defendants' conduct, as alleged herein, is and was contrary to public policy, immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. Any purported benefits arising out of Defendants' conduct do not outweigh the harms caused to the victims of Defendants' conduct.

91.     Defendants' conduct is also "unfair" because it is contrary to numerous legislatively-declared policies, as set forth in the Sherman Act, the Cartwright Act, the California Corporations Code and in the Commodities Exchange Act. Here, Defendants' conduct not only violates the letter of the law, but it also contravenes the spirit and purpose of each of those statutes. The conduct threatens an incipient violation of each of those laws and has both an actual and a threatened impact on competition.

92.     Defendants' conduct, as described above, also constitutes an "fraudulent" business practice within the meaning of the UCL. Defendants' trading activity on the California gasoline spot market fraudulently raised the price of gasoline above the competitive level through fictitious "wash" trades and other manipulative conduct that did not shift economic risk for the transaction to an arm's length counterparty. This conduct was designed to deceive—and did deceive—other market participants about the true supply and demand situation for gasoline in order to artificially increase the price of gasoline in California.

93.     Plaintiff and class members have suffered injury in fact and have lost money as a result of Defendants' violations of the UCL in that they paid more for gasoline than they would have paid in a competitive market. They are therefore entitled to restitution and injunctive relief pursuant to California Business and Professions Code §17203.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment on his behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

A. This action may proceed as a class action, with Plaintiff serving as the Class Representative, and with Plaintiff's counsel as Class Counsel;

B. Defendants have contracted, combined and conspired in violation of the Sherman Act and Cartwright Act;

C. Defendants have violated the UCL by engaging in conduct that constitutes unlawful, unfair and fraudulent business practices;

D. Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations;

E. Plaintiff and the Class are entitled to recover treble damages and/or restitution, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount subject to proof at trial;

F. Plaintiff and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate;

G. Plaintiff and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

    i. A judicial determination declaring the rights of Plaintiff and the Class, and the corresponding responsibilities of Defendants; and

    ii. Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from violations of the law as alleged herein.

H.  Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class;

I.  Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

J.  Plaintiff and the Class receive such other or further relief as may be just and proper.

## JURY DEMAND

Plaintiff, on behalf of himself and all others similarly situated, hereby demands a trial by jury as to all issues so triable.

Dated: June 29, 2020                          Respectfully submitted,


/s/ Dennis Stewart_____
Dennis Stewart (SBN 99152)
Kirk B. Hulett (SBN 110726)
**GUSTAFSON GLUEK PLLC**
600 B Street
17th Floor
San Diego, CA 92101
Telephone: (619) 595-3299
dstewart@gustafsongluek.com
khulett@gustafsongluek.com

Daniel E. Gustafson
Daniel C. Hedlund
Daniel J. Nordin
Ling S. Wang
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com
lwang@gustafsongluek.com

***Counsel for Plaintiff and the Proposed Class***